IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBERT B.,[1]

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,

Defendant.

Case No. 1:25-cv-01842-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

Plaintiff Robert B. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Title XVI Social Security Income under the Social Security Act. For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded for further proceedings.

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

## PROCEDURAL BACKGROUND[2]

Born in October 1972, plaintiff alleges disability beginning October 11, 2023,[3] due to actinomyces, glaucoma, varsities, hearing loss, depression, anxiety, and back, right hip, shoulder, and nerve pain. Tr. 194, 228, 233. His application was denied initially and upon reconsideration. On April 10, 2025, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a vocational expert ("VE"). Tr. 34-66. On April 23, 2025, the ALJ issued a decision finding plaintiff not disabled. Tr. 12-28. After the Appeals Council denied his request for review, plaintiff filed a complaint in this Court. Tr. 1-3.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity since the amended alleged onset date. Tr. 18. At step two, the ALJ determined the following impairments were medically determinable and severe: "persistent depressive disorder with anxious distress; somatic symptom disorder with predominant pain; cannabis use disorder i[n] remission; obesity; cervical spine degenerative disc disease; lumbar spine degenerative disc disease; right hip degenerative joint disease; right shoulder impingement syndrome and osteoarthritis." *Id.* At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 18-21.

---

[2] The record before the Court is nearly 1350 pages, but with some incidences of duplication. Where evidence occurs in the record more than once, the Court generally cites to the transcript pages on which that information first appears in its entirety.

[3] Plaintiff originally alleged disability as of June 1, 2021, but later amended his onset date. Tr. 15, 207, 228. As a result, plaintiff became ineligible for Title II Disability Insurance Benefits and accordingly withdrew that claim. Tr. 15, 228.

Because he did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected his ability to work. The ALJ resolved that plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except:

> occasional overhead reaching with the right arm; frequent climbing of ramps and stairs; occasional ladders, ropes, and scaffolds; and frequent stooping, kneeling, crouching, and crawling. He would need to avoid exposure to workplace hazards and avoid concentrated exposure to loud noise in the workplace. He can perform tasks that do not involve a specific production rate, such as assembly line work or an hourly production quota, and can deal with occasional changes in a routine work setting.

Tr. 21.

At step four, the ALJ determined plaintiff had no past relevant work. Tr. 26. At step five, the ALJ concluded, based on the VE's testimony, that there were a significant number of jobs in the national economy plaintiff could perform despite his impairments, such as cashier, office helper, and marker.[4] Tr. 27-28.

## DISCUSSION

Plaintiff argues the ALJ erred by: (1) discrediting his subjective symptom statements; (2) discounting the lay witness testimony of his spouse; and (3) improperly assessing the medical opinion of primary care provider Subhechchha Shah, M.D. Pl.'s Opening Br. 2-3 (doc. 10).

### I. Plaintiff's Testimony

Plaintiff contends the ALJ erred by rejecting his testimony concerning the extent of his physical and mental impairments. When a claimant has medically documented impairments that

[4] The VE testified that the representative occupations – each of which individually meet the significance requirement, and each of which are unskilled with a specific vocational preparation of 2 – could be performed with a cane for ambulation. Tr. 62-63. The VE also indicated that "marker work allows a sit/stand option." Tr. 63-64.

could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). In other words, the "clear and convincing" standard requires an ALJ to "show [their] work." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022).

Thus, in formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, *available at* 2017 WL 5180304. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted). The question is not whether the ALJ's rationale convinces the court, but whether the ALJ's rationale "is clear enough that it has the power to convince." *Smartt*, 53 F.4th at 499.

At the hearing, plaintiff testified that he was unable to work due to fatigue and widespread body pain. *See, e.g.*, Tr. 42-43, 48. Plaintiff also endorsed depression – he "get[s] down on [him]self" because he is "not able to work[,] earn money, [and] support [his] family." Tr. 52. There

are "time[s] where [he does not] even want to leave the house[,] be out in public, [or] see the sunshine." Tr. 53.

When asked about activities, plaintiff reported he could do dishes for ten to fifteen minutes, but could not clean because its "too much . . . bending over and things." Tr. 46. He helped his wife with her online candle business for "four to five hours a week" by "cold calling other businesses," taping up boxes, and printing items such as shipping labels. Tr. 42-43. He drove, but only locally and occasionally. Tr. 41. Plaintiff testified further that he tried to go to the grocery store to get out of the house once a week but due to his "incontinence, and the pain of walking for so long," he had to "hold on to the cart while [his wife] pushes" and "does most of the . . . shopping." Tr. 45. He stopped regularly attending church in-person on Sundays because the seating was very hard and caused pain. Tr. 56.

In terms of functional abilities, plaintiff testified that was limited to lifting no more than five pounds, otherwise he "start[s] feeling it in [his] back" and right shoulder. Tr. 50. Plaintiff clarified that, in regard to his right shoulder, he struggled with overhead reaching but could reach forward "as long as it [was] not repetitive." Tr. 51. He changed positions throughout the day and night, and used a prescribed cane (and occasionally an unprescribed walker) to manage his pain and mobility issues. Tr. 44-45, 53-54. He employed the cane while walking, and even while standing, for fear of falling. Tr. 49. He explained he naps every day because of poor sleep and otherwise spends about three to four per day laying down. Tr. 53-54.

As a result of plaintiff's medical impairments and their limiting effects, plaintiff explained he has relied on his wife as a state-paid caregiver since November 2023. Tr. 39-40. She performed

all household chores and childcare,[5] and also assisted plaintiff with changing positions, using the bathroom, and getting dressed. Tr. 46, 50.

After summarizing the hearing testimony, the ALJ determined that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 22. In particular, the ALJ relied on the lack of corroborating objective findings and plaintiff's failure to follow treatment, exaggerated symptoms and "poor effort," daily activities, and history of conservative treatment. Tr. 23-25.

**A. Daily Activities**

"Even where [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012). In his March 2024 Adult Function Report, plaintiff described a typical day as follows:

> I have breakfast and take medications. I do any website updates for the candle business [and] make video content for marketing. [I] have lunch and watch Bible sermons. Sometimes [I] have [an] afternoon nap. If not, I will do admin[istrative] duties for [the] candle biz, or watch marketing classes [and then] have dinner & meds . . . My wife and I have 3 sons at home. I help them stay on task, help [my wife] prepare their dinner by setting [the] table, plating their food.

Tr. 250, 256. As far as chores, he endorsed the ability to feed pets, make quick meals or snacks, load the dishwasher, and help fold laundry. Tr. 251. As far as hobbies, plaintiff stated: "I like to learn about God so I read the Bible a couple times a week. Sometimes more. I like learning about how to improve our small business so I will watch videos" or attend on-line classes. Tr. 253.

---

[5] At the time of the hearing, plaintiff resided with his wife and three stepchildren, ages 10, 14, and 18. Tr. 39.

In May 2024, plaintiff expressed that taking Cymbalta "help[ed] him . . . He has not been worrying about different things and has been able to focus on his business." Tr. 991, 1050. In June 2024, he similarly reported that, "[s]ince early 2022, he and his wife have been running a candle business." Tr. 991; *see also* Tr. 1039 (specifying to a different provider in June 2024 that he "and [his] wife have a candle business . . . [he has] stopped doing heavier lifting and has moved to administrative side of business"). Although his role had "been minimal lately," and he often would prefer to "just lay in bed and watch a movie and fall asleep," the "business [still] kind of [kept him] motivated as sales come in to try to stay on top of things." Tr. 991-92. At that time, he also "report[ed] recently [starting to roast] his own coffee" and "correspond[ing] online" with out-of-state friends. Tr. 992. In August 2024, plaintiff stated he had "been going to the YMCA and it has been going well," and that he was at the "gym . . . 3 days per week." Tr. 1154.

In February 2025, plaintiff was struggling more with depression and grief related to the death of his father but still managed to "run . . . his candle business with his wife." Tr. 1255. He indicated "engaging in prayer and business activities as a form of distraction from his depressive symptoms. He also spends time with his children." Tr. 1247. In March 2025, plaintiff remarked that he "works from home – owns his own business with wife [and] [e]njoys working with his wife." Tr. 1308.

The ALJ reasonably inferred from the aforementioned activities that plaintiff's physical and mental functional abilities were greater than alleged. *See Febach v. Colvin*, 580 Fed.Appx. 530, 531 (9th Cir. 2014) (ALJ is not required to accept a claimant's attempt to characterize activities as consistent with disability where those activities "could also reasonably suggest" greater functional abilities) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004)).

### B. Failure to Follow Treatment

A lack of treatment or the failure to follow a prescribed course of treatment is a clear and convincing reason to reject subjective symptom testimony. *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989). While the ALJ must consider the claimant's explanation for not following a prescribed course of treatment, the "failure to assert one, or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony." *Id.* at 603; SSR 16-3p, *available at* 2017 WL 5180304.

Substantial evidence supports the ALJ's determination as to this issue. For instance, plaintiff was referred to a neurosurgeon in July 2023 after he endorsed "chronic low back pain . . . for many years" and reported being "severely disabled," and an MRI "demonstrate[d] mild lateral recess stenosis at L4-5 related to degenerative type changes with mild L4 and L5 neural foraminal narrowing." Tr. 457-58, 492. However, at an October 2023 appointment, plaintiff "stated that he ha[d] not heard from that office." Tr. 452. Dr. Shah directed plaintiff to reach out to the neurosurgical office to arrange an appointment but there is no indication in the record before the Court that plaintiff did so or otherwise attended any neurosurgery consult. Tr. 451-452.

Moreover, plaintiff's treating providers repeatedly recommend physical therapy, but he was inconsistent in his attendance or wholly failed to go. Tr. 951, 1032, 1151, 1271. Regarding shoulder pain, plaintiff was first referred to physical therapy in 2023 after a corticosteroid injection provided limited relief. Tr. 437, 439, 951. Plaintiff reported this treatment modality "was helping him but he did not complete physical therapy." Tr. 951. He then returned to physical therapy for his shoulder in 2024 but was "inconsistent with physical therapy due to complaints of being bedridden and incontinent in July 2024." Tr. 23, 1032. Yet, in May 2024, plaintiff had been

referred to "pelvic floor therapy" to help with incontinence.[6] Tr. 1049. In August 2024, Dr. Shah again referred plaintiff to physical therapy for his shoulder, noting that there was "[n]ot much improvement symptomatically," but there was "[i]mprovement in the testing done by physical therapy." Tr. 1150-51. She also pleaded with plaintiff to "keep [his] appointment with pelvic floor therapy" but there is once again no indication that plaintiff followed up. Tr. 1151.

### C. Exaggerated Symptoms and Poor Effort[7]

An ALJ may discount symptom testimony when evidence in the record indicates "a claimant's tendency to exaggerate symptoms," or that the claimant "failed to give maximum or consistent effort during [a] physical capacity evaluation." *Colleen G. v. Comm'r of Soc. Sec.*, 625 F. Supp. 3d 1129, 1135 (W.D. Wash. 2022) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001)); *Thomas*, 278 F.3d at 959. Here, the record demonstrates a pattern of over-endorsing symptoms. Notably, in September 2023, one of plaintiff's treating providers observed "his current MRI lumbar spine and physical exam findings are not correlative with the degree of disability and pain he is experiencing." Tr. 457. In December 2024, plaintiff gave "poor effort with strength testing in the upper and lower extremities" during a routine examination. Tr. 1200.

Additionally, plaintiff presented to the emergency department a number of times with vague or shifting complaints. For example, in May 2024, he sought emergent care for a spider bite but "denie[d] any other somatic complaint." Tr. 979. He was given antibiotics and discharged. *Id.* During a follow-up appointment with Dr. Shah, plaintiff became concerned about a new "area of pain and swelling close to the area where he" had the spider bite and also was convinced that "his

---

[6] Dr. Shah noted that his incontinence was "less likely from a spinal problem and possibly due to weak pelvic floor, weight gain, or prostate enlargement," hence the order for pelvic floor therapy. Tr. 1049.

[7] Plaintiff does not discuss this reasoning or any potential somatic symptom overlay in his briefs.

spine [was] causing [his incontinence]," despite mild MRI findings. Tr. 1050. In September and December 2024, plaintiff sought emergent care for seemingly routine issues – e.g., neck pain of a non-traumatic origin and chest pain (that was "similar to reflux"). Tr. 1220, 1235. Each time he was discharged following tests that yielded unremarkable results. Tr. 1224, 1235. Dr. Shah subsequently "[r]eassured [plaintiff] that [his chest pain was] less likely to be cardiac in nature," but he nonetheless returned to the emergency department the following week, again complaining of chest pain. Tr. 1198, 1271.

At that point, plaintiff was "insistent he get a CT scan" but also "wanted a whole-body MRI," but he did "not meet any criteria for an emergent [CT scan or] MRI." Tr. 1205. Plaintiff's lab results and other testing were also predominantly normal, so his provider assessed "a component of anxiety and . . . perseverating." *Id.* Plaintiff was nonetheless "very angry and frustrated at [the time of] discharge," describing the provider as "complete[ly] dismissive," despite the fact that he "spent more time [with plaintiff] than [he] would typically [with a] similar patient who did not have obvious affect or concern." *Id.* While the treating provider was preparing plaintiff's discharge paperwork, "he started stating that he occasionally has actinomycoses breakouts in his groin [and was] concerned that this [was] affecting his spine and his internal organs[,] and [that he] want[ed] testing for this." Tr. 1205-06. Shortly thereafter, plaintiff became convinced that he had Lupus, despite there being no apparent work-up for this condition in the record. Tr. 1255, 1333.

In sum, the ALJ provided at least one legally sufficient reason, supported by substantial evidence, for affording less weight to plaintiff's subjective symptom testimony. The ALJ's decision is affirmed as to this issue.

## II. Lay Witness Testimony

Plaintiff also asserts the ALJ erred in rejecting the lay testimony of his spouse. "Lay testimony as to a claimant's symptoms is competent evidence that the [ALJ] must take into account." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citation omitted); 20 C.F.R. § 416.929(c)(1) ("In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you."). Under the 2017 regulations, the ALJ is "not required to articulate how [they] considered evidence from nonmedical sources using" the same criteria required for the evaluation of medical sources. 20 C.F.R. § 416.920c(d). The ALJ must nonetheless articulate their assessment of lay witness statements under the new regulations. *Tanya L.L. v. Comm'r Soc. Sec.*, 526 F. Supp. 3d 858, 869 (D. Or. 2021).

Here, the ALJ's sole comment regarding the lay testimony was as follows: "I considered the supportive statements and observations from [plaintiff's] spouse concerning his impairments and associated decreased work capacity when determining the above residual functioning capacity pursuant to SSR 16-3p." Tr. 20. Nevertheless, any error in regard to the lay testimony is harmless because the ALJ's reasons for affording less weight to plaintiff's testimony apply equally to his spouse's statements. *Compare* Tr. 257-66, 303 (lay statements), *with* Tr. 39-58, 249-56, 278-85 (plaintiff's subjective symptoms statements); *see also Molina*, 674 F.3d at 1114, 1117, 1222 (ALJ is not required "to discuss every witness's testimony on an individualized, witness-by-witness basis," such that no harmful error occurs where "lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony"); *Lori R. v.*

*Comm'r, Soc. Sec. Admin.*, 2024 WL 4544305, *5 (D. Or. Oct. 22, 2024) (affirming the ALJ's treatment of the lay testimony decision under analogous circumstances).

**III. Medical Opinion Evidence**

Plaintiff next asserts the ALJ improperly discredited the opinion of Dr. Shah. Where, as here, the plaintiff's application is filed on or after March 27, 2017, the ALJ is no longer tasked with "weighing" medical opinions, but rather must determine which are most "persuasive." 20 C.F.R. § 416.920c(a)-(b). "To that end, there is no longer any inherent extra weight given to the opinions of treating physicians . . . the ALJ considers the 'supportability' and 'consistency' of the opinions, followed by additional sub-factors, in determining how persuasive the opinions are."[8] *Kevin R. H. v. Saul*, 2021 WL 4330860, *4 (D. Or. Sept. 23, 2021). The ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" and "explain how [they] considered the supportability and consistency factors." *Id.* At a minimum, "this appears to necessitate that an ALJ specifically account for the legitimate factors of supportability and consistency in addressing the persuasiveness of a medical opinion." *Id.*

Dr. Shah has treated plaintiff "every few months" since 2017. Tr.450, 1170, 1243. In August 2024, Dr. Shah completed a "Treating Source Statement," listing plaintiff's diagnoses as degenerative disc disease, lumbar radiculopathy, right-sided shoulder impingement, migraines, bladder incontinence, diabetes, glaucoma, tinnitus, depression, anxiety, and obesity. Tr. 1170. She then indicated that plaintiff's associated symptoms include shoulder, neck, back, and hip pain, and headaches. Tr. 1171. She cited to plaintiff's "abnormal" lumbar and cervical MRIs, and "abnormal" glucose blood test, as the clinical signs underlying plaintiff's impairments. *Id.*

[8] As the Ninth Circuit recently explained, "[u]nder the revised regulations . . . a medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

Dr. Shah opined plaintiff needed to: lie down throughout the day (he could stand/walk or sit no more than two hours each in an eight-hour workday); change positions every 15-30 minutes; and take 10-15-minute breaks every hour. Tr. 1171-73. In addition, she opined that plaintiff would be off task "25% or more" in relation to "simple work tasks," and would miss more than four days of work per month due to pain. Tr. 1174.

The ALJ found Dr. Shah's opinion "partially persuasive." Tr. 26. In particular, the ALJ credited Dr. Shah's opinion with respect to plaintiff's shoulder impairment but otherwise discounted it:

> [Dr. Shah's] opinion is not consistent with the objective evidence that shows [plaintiff's] degenerative changes of the spine and hips are only mild for which he has received conservative treatment and physical exam findings of no tenderness to palpation or major deformities, good range of motion in all major joints, and negative straight leg raise in both lower extremities. Moreover, Dr. Shah's own treatment notes do not include physical exam findings consistent with the degree of limitation that [s]he opines. The record does show that [plaintiff] has decreased range of motion of the right shoulder that would warrant restriction in overhead reaching but no neurological findings to support the level of limitation suggested in the remainder of [her] opinion.

*Id.* (internal citations omitted).

As an initial matter, the type of routine examination findings cited by the ALJ are insufficient to disregard clinical signs and signals, especially where, as here, myriad forms of objective medical evidence corroborate plaintiff's claims. *See* Tr. 405, 458, 464, 510 (plaintiff's imaging studies); *see also* *Morgan v. Colvin*, 2013 WL 6074119, *7 (D. Or. Nov. 13, 2013) ("rote observations recorded in plaintiff's medical record" that she "had normal muscle tone upon examination [and was] 'healthy-appearing' " had "no bearing on whether she suffers from pain, fatigue, or weakness"); *Kimberly M. v. Comm'r Soc. Sec.*, 2020 WL 416274, *3 (W.D. Wash. Jan. 27, 2020) (reversing the ALJ's decision as to a medical opinion where, amongst other reasons, the ALJ did not explain how the claimant's "routine findings" were inconsistent with the assessed

limitations); *Dahl v. Comm'r of Soc. Sec.*, 2015 WL 5772060, *5 (D. Or. Sept. 30, 2015) (even "mild degenerative disc disease can have disabling effects") (collecting cases); *Ellefson v. Colvin*, 2016 WL 3769359, *6 n.5 (D. Or. July 14, 2016) ("mild degenerative changes do not necessarily equate to mild functional limitations").

This is especially true considering that Dr. Shah's notes repeatedly document plaintiff's ongoing chronic pain symptoms. *See, e.g.*, Tr. 451-52, 599-600, 951, 1272, 1277. Finally, while it is questionable whether plaintiff's treatment can fairly be deemed conservative based on precedent from with the Ninth Circuit, there also is no indication in either Dr. Shah's chart notes or the overall record that other modalities of care would have ameliorated plaintiff's constellation of symptoms. *Cf. Cortes v. Colvin*, 2016 WL 1192638, *4 (C.D. Cal. Mar. 28, 2016) ("an ALJ errs in relying on conservative treatment if the record does not reflect that more aggressive treatment options are appropriate"). The ALJ therefore erred in regard to Dr. Shah's opinion.

**IV. Remedy**

The decision whether to remand for further proceedings or for the immediate payment of benefits lies within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1176-78 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098-1102 (9th Cir. 2014). The court may not award benefits punitively and must conduct a "credit-as-true" analysis on evidence that has been improperly rejected by the ALJ to determine if a claimant is disabled. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011); *see also*

*Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (summarizing the standard for determining the proper remedy).

As discussed herein, the ALJ committed harmful legal error in regard to Dr. Shah's opinion. Further proceedings would nonetheless be useful to resolve ambiguities in the record. On one hand, the record documents plaintiff's longstanding impairments and pain. *See, e.g.*, Tr. 450-52, 457-58, 599-600, 951, 1272, 1277. On the other hand, it is unclear from the record whether those symptoms are a result of plaintiff's physical impairments (as opposed to his somatic symptom disorder), and there is evidence of other, more recently diagnosed impairments – namely, migraines – that appear to further erode plaintiff's occupational functioning. *See* Tr. 48-49, 1085, 1206.

As such, further proceedings are required to resolve this case. *See Treichler*, 775 F.3d at 1099 (except in "rare circumstances," the proper remedy upon a finding of harmful error is to remand for further administrative proceedings). Upon remand, the ALJ must reweigh the medical and other evidence of record, and, if necessary, reformulate plaintiff's RFC and obtain additional VE testimony.

**CONCLUSION**

For the reasons stated above, the Commissioner's decision is REVERSED, and this case is REMANDED for further proceedings.

IT IS SO ORDERED.

DATED this 26th day of October, 2026.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge